UNITED STATES OF AMERICA

                                        MEMORANDUM
                                        AND ORDER

- against -　　　　　　　　　　　　07-CR-772 (JG)

ANTHONY McCRAE,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

A P P E A R A N C E S :

    BENTON J. CAMPBELL
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:    Stephen J. Meyer
        Attorney for Government

    FEDERAL DEFENDERS OF NEW YORK, INC.
        16 Court Street, 3rd Floor
        Brooklyn, NY 11201
    By:    Len Hong Kamdang
        Attorneys for Petitioner

JOHN GLEESON, United States District Judge:

        Defendant Anthony McCrae, charged with illegal possession of a firearm, moves to suppress the fruits of an investigative detention as unconstitutionally obtained. For the reasons set forth below, the motion is granted.

# FACTS[1]

On September 16, 2007, Police Officer Kaz Daughtry, a relatively junior officer employed by the New York City Police Department, was performing quality of life patrol in the 73rd Precinct in Brooklyn in plainclothes in an unmarked car with two other police officers, one of whom was in uniform. At approximately 3:00 AM, Daughtry observed a group of ten to fifteen individuals (males and females) standing in the playground outside of 265 Livonia Avenue, which is part of the Tilden Houses, a public housing project under the jurisdiction of the New York City Housing Authority. Daughtry knew the location to have a history of robberies and drug sales, and had made an arrest for possession of a firearm approximately 50 to 80 feet away several weeks earlier.

Daughtry stated that the individuals he observed on September 16, 2007 were talking loudly and at least one of them was using marijuana. As Daughtry pulled up, he observed McCrae shake hands with several members of the group and walk away. It is unclear from the officer's testimony whether McCrae began shaking hands before or after becoming aware of the officers, but it was Daughtry's impression that McCrae left at the sight of the officers. McCrae walked at a normal pace directly away from the police car. Daughtry exited the car and walked towards McCrae, who continued at the same pace away from him.

Daughtry testified that when he was approximately 30 feet behind McCrae,[2] he

---

[1] These findings of fact are based on the testimony of Police Officer Kaz Daughtry at the January 4, 2008 evidentiary hearing on the motion and at an October 10, 2007 bail hearing. Additional findings of fact are included in the Analysis section, *infra*.

[2] Daughtry described the distance by reference to the position of the courtroom podium relative to the witness stand. Though I estimated that distance to be 25 feet at the time, later in the hearing it was measured to be 30 feet.

observed McCrae, who was still walking away, move his hand as if moving an object from the center of his stomach to the left side of his waistband.  Daughtry stated that he believed McCrae was moving a firearm from the center of his waistband to the side of the waistband, even though from his vantage point 30 feet behind McCrae he could not see a firearm.  Daughtry based his conclusion on the fact that he himself has made similar movements when adjusting his own firearm when he was in plainclothes.  He also observed other officers in plainclothes make similar movements on approximately five other occasions.

Daughtry claimed that his methodology of observing police officer movements and watching civilians to see if they made such movements was described in an article he was provided at the Police Academy.  The article recounts the experience of a police officer who made numerous arrests for firearms based on observing telltale signs he learned from watching criminals and other police officers.  *See* Erik Eckholm, *Who's Got A Gun?  Clues Are In the Body Language*, N.Y. Times, May 26, 1992.  Daughtry stated that he attempted to emulate the methodology used by the police officer in the article.  When I asked about the rate of return yielded by this technique, he said that he tested the technique over a three-day period in which he made 30 to 50 stops based on telltale movements he identified using the methodology described in the article.  Of these 30 to 50 stops, only one individual had a firearm.  In response to further questioning by counsel for the government, Daughtry claimed that none of the 30 to 50 people he had stopped using this methodology had made the distinctive movement of their hand from the center to the left of their waistband that he observed McCrae make.

Daughtry claimed that he believed based on his observations that McCrae had a

3

gun and was preparing for a "fight or flight" response. Suppression Hr'g Tr. 13. Daughtry did not testify that he drew his firearm and did not indicate whether either of the two other officers he was on patrol with ever exited their vehicle or assisted him. Daughtry said "police, stop," and McCrae immediately stopped and turned around while Daughtry approached to within arm's reach. When McCrae turned, Daughtry observed for the first time a bulge under McCrae's oversized black T-shirt. He believed that this bulge was the butt of a pistol with the barrel pointed down and the stock protruding forward.

McCrae stated that he was armed and claimed that he was a bail bondsman licensed to carry a firearm.[3] Daughtry retrieved the pistol and arrested him.

ANALYSIS

The Fourth Amendment forbids the government from violating "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It does not "proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 619 (1989). A warrantless search or seizure is "per se unreasonable" unless it falls within "one of the few established and well-delineated exceptions" to the warrant requirement. *United States v. Streifel*, 665 F.2d 414, 419-20 (2d Cir. 1981). One such exception is the exception for temporary investigative detention and protective pat-down searches in street encounters, known colloquially as the "stop and frisk" exception. *Id.* at 420 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

The government concedes that McCrae was seized for Fourth Amendment

---

[3] While McCrae contends that he was in fact a bail bondsman and believed at the time he was licensed to carry a gun, at the October 10, 2007 bail hearing I determined that his statement to Daughtry was false.

4

purposes when Daughtry said "police, stop" and McCrae stopped. *See, e.g.*, *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) ("A seizure of the person within the meaning of the Fourth Amendment occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quotation marks omitted))). Whether the stop is justified depends on whether Daughtry, prior to saying "police, stop," had reasonable suspicion that McCrae was committing a crime.[4] *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("[T]he Fourth Amendment is satisfied if the officer's action [*i.e.*, brief investigatory detention] is supported by reasonable suspicion to believe that criminal activity may be afoot." (internal quotation marks omitted)); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) (noting that frisk can only be lawful if forcible stop is lawful). In determining whether reasonable suspicion exists, I am obliged to consider the "totality of the circumstances" in order to determine whether the officer has "a particularized and objective basis for suspecting wrongdoing." *Arvizu*, 534 U.S. at 274 (internal quotation marks omitted).

The government argues that McCrae's presence in a high-crime area and departure upon seeing the officers raised Daughtry's level of suspicion. Gov.'s Mem. Opp. Mot. Suppress 11-12. While flight upon seeing police officers can give rise to reasonable suspicion if

---

[4] Daughtry stated in his testimony at the October 10, 2007 bail hearing that he believed McCrae and others were engaged in the crime of unlawful assembly. Bail Hr'g Tr. 15. However, the government concedes that Daughtry did not have probable cause to suspect McCrae of unlawful assembly. Daughtry also stated that presence in the playground after dusk was prohibited. Bail Hr'g Tr. 4, 14-15. However, there is no prohibition on residents of 265 Livonia Avenue being present in the playground after dusk. Since Daughtry had no reason to believe that McCrae was not a resident, he had no probable cause to suspect McCrae of trespassing, as the government concedes. *See* Gov.'s Supplemental Letter, Dec. 27, 2007.

it occurs in a high-crime area, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight . . . is the consummate act of evasion"), it is clear, and I find, that McCrae's behavior fell well short of this threshold, *cf. id.* at 125 ("'[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'" (quoting *Bostick*, 501 U.S. at 437)). Far from running headlong, McCrae calmly walked away from Daughtry, shaking hands with the people he was standing with before leaving and at no time quickening his pace.

I am not persuaded by the government's contention, advanced at oral argument, that the fact that McCrae walked directly away from Daughtry constituted an evasive "change of direction." Suppression Hr'g Tr. 34. In ordinary parlance, it would be awkward to describe someone's transition from standing to walking as a "change of direction." More to the point, all of the cases the government cites on evasive conduct describe behavior that is out of the ordinary for some reason other than the mere arrival of officers when the conduct begins. *See Wardlow*, 528 U.S. at 124 ("nervous, evasive behavior" and "[h]eadlong flight"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) ("erratic driving or obvious attempts to evade officers"); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) ("strange movements in [the defendant's] attempt to evade the officers"); *United States v. Sokolow*, 490 U.S. 1, 8 (1989) ("[taking] an evasive or erratic path through an airport"). Simply beginning to walk, absent additional indicia of evasion, is not closely correlated with criminality. People who are standing start walking all the time. Inevitably, sometimes it will happen with police officers around.

While furtive motions or gestures can give rise to reasonable suspicion, *see, e.g.*,

6

*United States v. Paulino*, 850 F.2d 93, 97 (1988) (justifying protective search of car based on "hurried and furtive" movements of passenger hiding object under floor mats), I find that Daughtry did not observe movements by McCrae that an objectively reasonable officer would find suspicious. Even assuming Daughtry saw McCrae move in a fashion consistent with moving his hand from the center of his stomach to the left side of his waist, McCrae did not move in a sufficiently suspicious manner to justify the stop.[5]

Daughtry explained in unusual detail his basis for considering the movements to be suspicious, but this explanation only highlights the inadequacy of his grounds for stopping McCrae. Daughtry found McCrae's motions to be suspicious because they resembled his own motions in handling firearms while in plain clothes. However, Daughtry made the illuminating admission that his "technique" of stopping people because their motions are analogous to officer motions, when he tested it in practice, yielded one arrest out of 30 to 50 stops.[6] Probable cause

---

[5] I am of course not obliged to defer to Daughtry's description of the movements as "furtive." Suppression Hr'g Tr. 18. Judge Posner has reflected on the inadvisability of uncritically accepting such generic police characterization of civilian behavior:

> Gilding the lily, the officer testified that he was additionally suspicious because when he drove by Broomfield in his squad car before turning around and accosting him he noticed that Broomfield was "star[ing] straight ahead." Had Broomfield instead glanced around him, the officer would doubtless have testified that Broomfield seemed nervous or, the preferred term because of its vagueness, "furtive." Whether you stand still or move, drive above, below or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.

*United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (Posner, J.) (internal citations omitted). To his credit, Daughtry did not lean heavily on this adjective in his testimony. As stated below, he provided specific reasons he found McCrae's movements to be suspicious, but the reasons do not rise to the level of reasonable suspicion.

[6] While he was not asked whether he considered one successful stop out of 30 to 50 to be an acceptable success rate, Daughtry gave no indication that he felt his technique of observing officer behavior yielded

and reasonable suspicion have not been reduced to arithmetic probabilities, *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances."); *see also id.* at 372 (finding probable cause to suspect one out of three individuals in a car containing drugs of possessing the drugs "either solely or jointly"), but indicia of weapon possession that are correlated with actual weapon possession only one in 30 times are clearly constitutionally insufficient to justify an investigative detention. *Cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 34-36 (2000) (invalidating program of roadblocks conducted for law enforcement purposes even though approximately 9% of the stops led to arrests).[7]

The poor success rate of Daughtry's "methodology" indicates that it is little more than guesswork, and his reliance on it here does not help the government's case. Daughtry stated

---

too low a success rate.

[7] The Court in *Edmond* characterized the searches as suspicionless, because the officers stopped cars in a predetermined sequence, and thus without particularized suspicion for any car. *Id.* at 35. However, the case may still be instructive in probing the lower bounds of what level of likelihood is necessary to give rise to reasonable suspicion. Suppose that reasonable suspicion of a crime were defined as awareness of at least a 9% likelihood of a crime. If the drivers stopped through *Edmond*'s roadblock are a representative sample of the drivers that pass through the roadblock -- a reasonable assumption due to the discretionless system employed to select which cars to stop -- then after conducting the roadblocks the police have awareness of a 9% likelihood that drivers passing through the roadblock are committing crimes. If awareness of a 9% probability is enough to support reasonable suspicion, then it would seem that further stops are *not* suspicionless after all -- the officers are aware that there is a 9% chance that each driver who passes through the roadblock is committing a crime, and thus have reasonable suspicion that each driver is committing a crime. Thus, if awareness of a 9% probability were sufficient to make out reasonable suspicion, it would be unclear what constitutional defect the *Edmond* roadblocks suffered from. *See* Wayne R. LaFave, *Search and Seizure* § 9.3(a) & n.14 (4th ed. 2004) (noting that most courts assume that reasonable suspicion justifies a traffic stop); *id.* § 9.5(a) n.3 (similar). I am mindful that reasonable suspicion cannot be captured solely by resort to probabilities, and I do not attempt to do so here. In particular, it may be more appropriate to focus on the size of the pool of suspects than the probability that any suspect within the pool has committed a crime. *See generally* Ronald J. Bacigal, *Making the Right Gamble: The Odds on Probable Cause*, 74 Miss. L.J. 279 (2004) (contrasting approaches to assessing probable cause). But while I accordingly do not consider *Edmond* -- which dealt with a very large pool of suspects -- to control this case, I find it quite significant that Daughtry's methodology for generating "suspicion" demonstrated at best a success rate of approximately 3.33%, well below the success rate of the suspicionless roadblocks in *Edmond*.

in response to follow-up questioning that none of the 30 to 50 stops he conducted in testing his methodology were based on the particular movement of a hand from the center of the stomach to the left side that he observed here. I am not persuaded by this attempt to dissociate Daughtry's observations of McCrae from the dismal record of Daughtry's observations of the 30 to 50 individuals on which he tested his techniques. Daughtry clearly stated he based his conclusions as to the import of McCrae's hand movements on his technique of observing officer behavior, and I am convinced that the behaviors he observed on this occasion were no more reliable indicia of criminality than the behaviors he observed in the 30 to 50 other cases he discusses.

Even disregarding Daughtry's poor success rate in identifying behaviors consistent with firearms possession, I conclude that he did not observe a sufficiently suspicious movement to justify stopping McCrae. Daughtry testified only that he observed, at 3:00 AM and from 30 feet behind, McCrae's hand move from the center of his stomach to his left side. Of course, Daughtry could not actually see McCrae's hand at all, as it was in front of McCrae's body and Daughtry was looking at McCrae's back. Based on Daughtry's description of what he saw and on his physical demonstration in the courtroom of McCrae's movement, I find that if Daughtry observed any movement by McCrae other than his walking away, it was a slight outward movement of McCrae's left elbow, and (perhaps) an even slighter backward movement of his left shoulder. He did not testify to, and I find he did not see, any change in gait, any bending at the waist, any shorter leg stride on one side, any looking at the waist, any shorter arm swing on one side as compared to the other, or any other indicia of weapons possession.[8] The

---

[8] The leg stride and arm swing comparisons are among the "hints" of gun possession enumerated in the methodology Daughtry emulated, as are "discordant clothes," a "brush" of the hand on the hip when stepping off

movement Daughtry described and demonstrated was insufficient to raise a reasonable suspicion that McCrae was committing a crime, even when taken together with the fact that McCrae was present in a high-crime area at night and walked unhurriedly away when the police arrived.[9]

Accordingly, considering the totality of the circumstances, I conclude that Daughtry's investigative detention of McCrae was not supported by reasonable suspicion. While the fact that McCrae was in fact found with a firearm suggests that Daughtry's suspicions were not entirely unfounded, the Fourth Amendment requires not just any suspicion but an objectively reasonable one.

## CONCLUSION

For the reasons stated above, the motion is granted. A status conference will be held on January 16, 2008 at 11:30 AM in Courtroom 6C.

So ordered.

JOHN GLEESON, U.S.D.J.

Dated: January 11, 2008
Brooklyn, New York

---

a curb, and the "classic bulge." Eckholm, *supra*.

[9] *Cf., e.g.*, *United States v. Rookard*, No. 05-CR-332S, 2007 WL 2176895, *5 (W.D.N.Y. July 27, 2007) (upholding frisk when defendant "immediately dropped his right hand very rapidly down out of [the officer's] sight towards his waist" upon being caught in a police spotlight (internal quotation marks omitted)); *United States v. Padilla*, No. 06-CR-824 (NGG), 2007 WL1958894, at *7-*8 (E.D.N.Y. June 29, 2007) (finding reasonable suspicion based on several factors including making a gesture which "did not appear to conform with any reasonable alternative explanation" and which was credibly demonstrated in court as a "distinctive gripping motion"). Finally, I do not credit Daughtry's testimony that he felt McCrae was preparing for a "fight or flight" reaction. Daughtry did not draw his firearm or take any apparent precaution to protect himself or the others present.